**Opinion filed May 23, 2019**



In The

# Eleventh Court of Appeals

_____

## No. 11-18-00338-CV

_____

## IN THE INTEREST OF A.T., A CHILD

---

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 8664-CX**

---

## M E M O R A N D U M   O P I N I O N

This is an appeal from an order in which the trial court terminated the parental rights of the mother and the father of A.T. Each parent filed a notice of appeal. On appeal, the parents challenge the sufficiency of the evidence to support the termination of their parental rights. We affirm.

Termination of parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2018). To determine on appeal if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding

was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). To terminate parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1)(A)–(U) and that termination is in the best interest of the child. FAM. § 161.001(b).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

In this case, the trial court found that the father had committed one of the acts listed in Section 161.001(b)(1)—that found in subsection (Q). Specifically, the trial court found that the father had knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and inability to

care for the child for not less than two years from the date that the petition was filed. With respect to the mother, the trial court found that she had committed three of the acts listed in Section 161.001(b)(1)—those found in subsections (D), (E), and (O). Specifically, the trial court found that the mother had knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being, had engaged in conduct or knowingly placed the child with someone who engaged in conduct that endangered the child's physical or emotional well-being, and had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the child, who had been in the managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent for abuse or neglect. The trial court also found, pursuant to Section 161.001(b)(2), that termination of the mother's and the father's parental rights would be in the best interest of the child.

The parents challenge the legal and factual sufficiency of the evidence in their issues on appeal. In the father's first issue, he challenges the trial court's finding under subsection (Q) and argues specifically that there was some evidence at trial that he could arrange for A.T. to be cared for by others until he was released from prison. In the father's second issue and the mother's first issue, they assert that the evidence is legally and factually insufficient to support the trial court's findings that it would be in the child's best interest to terminate the mother's and the father's parental rights. In the mother's second issue, she challenges the legal and factual sufficiency of the evidence with respect to the trial court's finding under subsection (O).

The record shows that the Department became involved with A.T.'s family when she was eight years old. At that time, A.T. was critically ill and was admitted to the PICU at Cook Children's Medical Center. A.T. had Type 1 diabetes, and the

mother was not providing appropriate care for A.T., despite having been instructed on how to do so. Family based safety services were instituted, but concerns about A.T.'s blood sugar continued, as did concerns about A.T. missing school, missing appointments at Cook, and running out of syringes. The next month, A.T. was removed from the mother's care. At the time of her removal, A.T. tested positive for amphetamine, methamphetamine, and cocaine. After A.T.'s positive drug test, her older sister, A.W., was also removed from the mother's care.

The record indicates that a family service plan was prepared for each parent. The uncontroverted evidence reflects that the mother failed to comply with some of the provisions of her service plan. She did not obtain or maintain employment during the eighteen months that this case was pending. And, most notably, the mother continued to test positive for methamphetamine, including a hair follicle test that was conducted five weeks prior to trial.

Approximately one year after A.T. was removed, but while the case was still pending in the trial court, the mother was a passenger in a vehicle that was stopped after leaving a known drug location. She had narcotics hidden in her undergarments and was arrested. About two weeks prior to the final hearing on termination, the mother pleaded guilty to the second-degree felony offense of possession of methamphetamine. Pursuant to a plea bargain agreement, the mother's ten-year sentence was suspended, and she was placed on community supervision for ten years.

After her arrest, the mother received inpatient treatment for her admitted drug addiction. However, she failed to timely sign up for outpatient treatment as required when she was released from inpatient treatment. Additionally, she continued to have various unapproved people in and out of her apartment, including a man named Byron that was living in the mother's apartment when A.W. and A.T. went there for a Christmas visit. The mother later admitted that Byron was one of her drug dealers.

While this case was pending, police were called to the mother's address numerous times, and at least one "violent episode" occurred there. The violent episode caused the mother to go to the "Noah Project."[1]

The mother testified at trial that she had sought and received treatment for her disease/addiction, that she was no longer doing drugs, and that her sobriety date was May 18, 2018—approximately three and one-half months prior to trial but more than fourteen months after A.T. was removed from the mother's care. The mother acknowledged that it took her a long time to admit that she had a drug problem and to seek help for it. She indicated that she was still seeing a counselor and that the appointments with the counselor were helpful. The mother did not want her parental rights to be terminated.

Nor did the father want his parental rights to be terminated. A.T.'s father was incarcerated during the entirety of this case. The record reflects that he committed an aggravated robbery with a deadly weapon while the mother was pregnant with A.T. and that he had been incarcerated A.T.'s whole life. The father was convicted and sentenced in 2009 to serve a fifty-year term of confinement for the aggravated robbery. Prior to the commission of that offense, the father had been convicted in 1993 of murder, for which he received a fifteen-year sentence and was released in 2006. The father had also been convicted of a felony in 1989—delivery of cocaine. According to the mother, A.T. had never met her father. The father, however, testified that he saw A.T. once when she was a few days old. Nonetheless, A.T. will be close to fifty years old when her father is projected to be released from prison.

Although the father was unable to personally care for A.T. upon her removal, he did suggest three of his family members as possible placements for A.T. The

---

[1]We note that the Noah Project is a facility for victims of family violence and sexual assault. http://noahproject.org/.

Department investigated these options. However, the Department determined that one of the suggested placements was not appropriate because her son lived with her and had been accused of sexual abuse of a minor. Another of the suggested placements indicated that she was physically unable to care for A.T. The other family member suggested by the father was not willing to be a placement. As recommended by one of the father's family members, the Department did eventually place the girls with another member of the father's family. However, after five months, that family member and her husband opted to terminate the placement. The girls were then placed in the adoptive foster home where they remained at the time of trial.

Not long before trial, the father suggested his fiancée as a potential placement. The fiancée, however, did not indicate that both girls could be placed with her, nor did the caseworker believe that it would be in A.T.'s best interest to be placed with the father's fiancée. The fiancée, who had no relationship with A.T., indicated that, if A.T. were placed with her, she and the father would then get married so that she could take A.T. to visit the father in prison. The record also reflects that the father had no known financial resources to provide for A.T.'s care.

The Department's goal with respect to A.T. was for her parents' parental rights to be terminated and, ultimately, for A.T. to be adopted. The conservatorship caseworker for the Department believed that, although it would be traumatic at first, it would be good for A.T. in the long run for the trial court to terminate the mother's parental rights. The guardian ad litem expressed great concern over returning A.T. to her mother. The Department also believed that termination of the father's parental rights would be beneficial to A.T.

There was no dispute that A.T. was bonded with her mother and that she did not know her father. A few weeks before trial, A.T. had indicated that she did not want her mother's parental rights to be terminated and that she wished to be returned

6

to her mother, but A.T. had also indicated that she wished to be placed with family. By the time of trial, A.W. and A.T. had been placed in an adoptive home, and things were going well in that home; however, they had only been in that home for thirty days. Therefore, it was not yet known if the foster parents in the adoptive home intended to adopt A.W. and A.T. The foster parents indicated that "they are in it for the long run" and "would not discharge these girls no matter what." The caseworker testified that, during the short period of time that the girls had been in this home, A.T. had become very close to the foster mother. A.T. asks her foster mother to put her to bed at night and to read to her. A.T. also tells the foster mother that she loves her.

In the mother's second issue, she challenges the sufficiency of the evidence to support the trial court's finding under subsection (O)—regarding the mother's failure to comply with the provisions of a court order. The mother, however, does not challenge the findings made by the trial court pursuant to subsections (D) and (E). Because either of the unchallenged findings is sufficient to support termination as long as termination is in A.T.'s best interest, we need not address the mother's challenge to the finding made pursuant to subsection (O). *See* FAM. § 161.001(b). Accordingly, we do not address the merits of the mother's second issue. *See* TEX. R. APP. P. 47.1.

In the mother's first issue, she challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in A.T.'s best interest. Based upon the *Holley* factors and the evidence in the record, as set forth above, we cannot hold that the trial court's best interest finding is not supported by clear and convincing evidence. *See Holley*, 544 S.W.2d at 371–72. We acknowledge A.T.'s previously expressed desire that her mother's parental rights not be terminated; however, considering A.T.'s desire to also be placed with other family, A.T.'s quick and strong bond with her new foster mother in an adoptive

home, A.T.'s emotional and physical needs, the mother's parental abilities, the danger to A.T. if returned to the mother's care, the mother's continued use of methamphetamine for well over one year after her children were removed, the mother's failure to enroll in outpatient drug treatment, the mother's unstable employment, and the Department's plans for A.T., the trial court could reasonably have formed a firm belief or conviction that it would be in A.T.'s best interest for her mother's parental rights to be terminated. We hold that the evidence is both legally and factually sufficient to support the trial court's best interest finding as to the mother. Accordingly, we overrule the mother's first issue.

As for the father's first issue on appeal, he challenges the legal and factual sufficiency of the evidence to support the trial court's finding under subsection (Q). To support a finding under subsection (Q), the record must show that the parent will be incarcerated or confined and unable to care for the child for at least two years from the date the termination petition was filed. FAM. § 161.001(b)(1)(Q); *In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006). The father does not dispute that he has been convicted of a crime and incarcerated, nor does he dispute the fact that he will remain incarcerated for at least two years from the date the petition was filed. Rather, he contends that he "produced some evidence at trial as to how he would arrange to provide care for the Child during his incarceration." We disagree.

The father was unable to personally provide for A.T.'s care and unable to support her financially; however, he did propose various substitute caregivers. As we discussed above, those potential substitute caregivers were not viable options. Furthermore, although the father's fiancée had said that she "is interested in placement of [A.T.]," the fiancée did not testify at trial. And there was no indication in the record that the fiancée was able and willing to care for A.T. on the father's behalf during his lengthy prison term. *See H.R.M.*, 209 S.W.3d at 110; *In re Caballero*, 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied).

8

The Department produced clear and convincing evidence from which the trial court could reasonably have formed a firm belief that A.T.'s father had knowingly engaged in criminal conduct, that he was duly convicted and imprisoned for that conduct, and that his imprisonment and inability to care for A.T. would continue for more than two years after the date that the petition was filed in this cause. In fact, more than forty years remained on the father's term of confinement at the time the Department filed its petition in this cause. Based on the evidence presented at trial, the trial court could reasonably have formed a firm belief or conviction that none of the proposed substitute caregivers was a viable option that was able and willing to care for A.T. on the father's behalf during his incarceration. We hold that the evidence is legally and factually sufficient to support the trial court's finding under subsection (Q). *See H.R.M.*, 209 S.W.3d at 108–10; *Caballero*, 53 S.W.3d at 396. We overrule the father's first issue.

In his second issue, the father challenges the trial court's finding that termination of his parental rights would be in the best interest of the child. With respect to A.T.'s best interest, the record reflects that she had been placed in an adoptive foster home and that she had bonded with her foster mother. The Department's goal for A.T. was termination and adoption. Although the father did not want his parental rights to be terminated and did not believe that termination would be in A.T.'s best interest, the father has no relationship with A.T. He has an extensive criminal history, and he committed a serious crime a few months prior to A.T.'s birth. For that crime, he was convicted and sentenced to a term of incarceration that will continue well into A.T.'s adulthood.

Based on the evidence presented at trial and the *Holley* factors, the trial court could reasonably have formed a firm belief or conviction that termination of A.T.'s father's parental rights would be in A.T.'s best interest. *See Holley*, 544 S.W.2d at 371–72. We hold that the evidence is both legally and factually sufficient to support

the trial court's best interest finding as to the father.  We overrule the father's second issue.

We affirm the trial court's order of termination.

JIM R. WRIGHT

SENIOR CHIEF JUSTICE

May 23, 2019

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[2]

Willson, J., not participating.

---

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.